Filed 4/22/16

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

**(Yolo)**

----

| | |
|---|---|
| THE PEOPLE, | C076235 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF13-0744) |
| v. | |
| SERGIO ALVAREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Yolo County, Timothy L. Fall, Judge.  Reversed in part and remanded with directions.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

---

\* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for partial publication, including the introduction, the Factual and Procedural Background, subparts 1.1, 1.1.1, 1.1.2, 1.1.3, and 1.1.5 of the Discussion, and the Disposition.

1

While on patrol in his official capacity as a police officer in West Sacramento, defendant Sergio Alvarez induced five women he encountered to provide him sexual favors, often to avoid being taken to jail. A jury convicted defendant of multiple counts of aggravated kidnapping, oral copulation under threat of authority and by duress, and rape under threat of authority and by duress. The jury also sustained kidnapping, residential burglary, and multiple victim sentencing enhancements. He now appeals, asserting there is insufficient evidence to support a number of his convictions, and the trial court made various instructional and sentencing errors. In the published portion of the opinion (subpts. 1.1, 1.1.1, 1.1.2, 1.1.3, and 1.1.5 of the Discussion, *post*) we address limitations on the lawful arrest defense to kidnapping. We will reverse the judgment as to several convictions, modify defendant's sentence as to others, remand for retrial as to one count, and otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Terri G.* (*Counts 1-3*)

Toward the end of August 2012, Terri G. was walking to her friend's house at about 4:00 a.m. when she was stopped by a police officer in a patrol car. Terri G. had been carrying methamphetamine that morning, but dropped it at a telephone booth before the officer stopped her. The officer pulled his car in front of her, got out of the car, and began searching through her purse. He began looking through her phone, asking if she was "working" and whether the names in her phone were dates. She told him she was not a prostitute and that she was going to see her boyfriend. The officer informed her she had a warrant. He placed Terri G. in the backseat of the patrol car without handcuffing her, and he returned her purse to her before closing the door. She felt that something "was not right."

The officer told her she did not have to go to jail, despite her warrant. He asked her again if she was a prostitute, and she responded that living on the street she had done

things to survive that she was not proud of and that she would not want to do again. He told her that she "knew what to do and to lay down." Not knowing what else to do, she complied. He began to drive; she was scared because he had a gun and she did not know what was going to happen. The car stopped in an alley, and defendant opened the car door and told her to get out. He instructed her to get down on her knees and to wipe off her lipstick. He exposed his penis, and she began to fellate him. The officer kept touching her back and head, complimenting her, and soliciting compliments from her. She repeated whatever he told her to say because she "just wanted to get out alive." Eventually, he told her to get up, remove her pants, and lie face down in the backseat of the patrol car. She complied because she did not feel she had any other choice. He had intercourse with her, and then instructed her to get on her knees again, outside the car. He inserted his penis in her mouth, held her by the neck and mouth, and ejaculated. She wiped the ejaculate on her jacket. She did what he told her to do without objection because she was scared that he would hurt her. She was not thinking about going to jail for the warrant; she did not realize she was not going to jail until after he told her to get dressed, to lay low, and that he would see her again.

She later talked to a friend, Kayla R., about the event. Based on their discussion about his physical description, she learned the officer was defendant. She reported the incident to another officer when she was arrested on the outstanding warrant about a week later. She identified defendant as the perpetrator in court and during an interview with detectives.

Defendant testified he encountered Terri G. one night as he was driving back to the police department. He asked if she had anything illegal on her person; she replied that she did not, but she was reaching into her pockets. She then consented to a search, which he conducted. Finding nothing, he let her go. Only later did he run a warrant

3

check of her name.  Defendant denied having any sexual contact with Terri G. and denied that she was in the backseat of his patrol car, despite the presence of her DNA.

The jury convicted defendant of kidnapping Terri G. to commit oral copulation, rape, or sexual penetration (count 1), committing oral copulation against her will by threatening to use his authority as a public official (count 2), and of committing oral copulation against her will by means of duress (count 3).  The jury also sustained the allegation that as to count 3, defendant had kidnapped the victim (enhancement 3a) and had committed the same crime against multiple victims.

### Anna B.  (*Counts 8-10*)

Anna B. is a heroin user and a self-professed "escort" who lives in Sacramento.  In September 2012, she was in West Sacramento staying with a friend.  In the middle of the night, she realized her cell phone battery was low and she did not have her phone charger with her.  She walked from her motel room looking for somewhere to buy a charger.  As she walked, a police officer in a patrol car (whom she identified at trial as defendant) pulled over, got out of the car, and began asking her questions.  She explained she was trying to buy a cell phone charger and asked if he knew where she could purchase one. He indirectly asked whether she was prostituting, and she responded she was not.  He asked her to get into the back of the patrol car so he could run her information.  She asked if there was any way to avoid that.  He responded she should get in for safety reasons, and that he would drive her to a store where she could purchase a charger.  She got in and he shut the door.

He drove to another location, where he stopped and checked her information on the computer and with the dispatcher.  It seemed to her that he was trying to find something to use as leverage against her, which made her nervous.  At some point in their conversation, she volunteered that she was under the influence of heroin.  He told her he could arrest her because she was under the influence.  He insistently asked if she knew of

4

any information to share with him, which made her feel she would have to divulge something to be set free.  She began to panic; she tried to reason with him and when that did not work, she began pleading with him and crying.  She felt helpless, trapped, and scared.  She began to get angry and asked why he did not just take her to jail.  She was scared and thought going to jail would be easier than dealing with him.  He told her he could not let her go unless she gave him something.  She offered to give him her phone number.  He responded that he could take her somewhere more private.  She told him she would rather not, and that she would rather be taken to jail or released.  He repeated he would take her somewhere more private to discuss it.  They drove somewhere dark and remote.  While driving, he made comments that made her think he was trying to get her to solicit him or bribe him.  He let her out of the car and implied he wanted sexual conduct from her; she was intimidated, and felt she had to comply with his orders.  She did not necessarily think he would kill her, but she was frightened of more than just incarceration.

He lifted her onto the trunk of the car and made a comment about her breasts.  When he was putting her back on the ground, she accidentally touched the button on the radio positioned on his shoulder, and he silenced her while he responded to someone asking if he was all right.  He then placed her hand on his penis, and directed her to fellate him.  She complied.  For a short time, he handcuffed her because she said, "you are a police officer and you are making me do this, so you might as well put me in the handcuffs and . . . do it right . . . ."  However, he removed them because she was having a difficult time fellating him.  He also felt her breasts, and may have touched her vagina.  Afterward, when she commented about him ejaculating in her mouth, he gave her a piece of gum.  He drove her to a gas station, let her go, and said he would "give [her] a call."  She went in, bought her cell phone charger, and walked back to her motel.

About a month later, in Sacramento, Anna B. was sleeping on the street with her boyfriend. A female police officer woke her up. Anna B. told her about the sexual encounter with defendant. The female officer had Anna B. speak to a sergeant and some detectives about the incident.

Defendant testified he met Anna B. when he saw a man walking down the street and Anna some distance behind him. When he approached, Anna B. walked toward his patrol car and said she was glad he stopped because the man was "creeping" her out. Defendant obtained Anna B.'s name and ran it through his system. He then got out of the car and talked to her; she did not appear to be intoxicated or under the influence at that time. As she was trying to find somewhere to buy a phone charger, he told her there was a store nearby that would probably have one and offered her a ride, which she accepted. She flirted with him while they drove, and he asked if she wanted to stop and talk. She agreed, so he parked and they talked for 10 to 15 minutes. She offered to give him her phone number, but another patrol car drove by, so defendant suggested they go somewhere more private. She assented, so he drove to an industrial area and got out of the car. He let her out and they began kissing. She said the situation was like a "fantasy." She accidentally hit the lapel microphone to his radio as he helped her off the trunk of the car, and he heard the dispatcher. She asked if he was going to handcuff and frisk her, so he handcuffed her behind her back and groped her breasts as she groped his groin (he was standing behind her). It seemed to him that she was trying to unzip his pants, so he unzipped them and she began to perform oral sex. She told him the handcuffs were uncomfortable, so he removed them and she completed the act. After talking some more he dropped her at a store so she could purchase her phone charger.

The jury convicted defendant of kidnapping Anna B. to commit oral copulation or sexual penetration (count 8), committing oral copulation against her will by threatening to use his authority as a public official (count 9), and of committing oral copulation

6

against her will by means of duress (count 10). The jury also sustained the allegation that as to count 10, defendant had kidnapped the victim (enhancement 10a) and had committed the same crime against multiple victims.

***Kayla R.*** (***Counts 13, 15-16***)

Kayla R. was first approached by defendant, who was driving his patrol car, in October 2011 at about 3:00 or 4:00 in the morning while she was sitting at a bus stop in front of a bar. She was high at the time and had a pipe and methamphetamine in her purse. (She was also under the influence of methamphetamine when she testified at trial.) She consented to defendant's request to pat her down and search her purse. He found her pipe, handcuffed her, and placed her in the backseat of the patrol car. He left her there with the door closed while he spoke to other police officers. She was scared and thought she was going to jail. After the other officers left, defendant opened the door and asked why he should not take her to jail. He then repeatedly asked if she had something to offer him, left her in the backseat to think some more, and shut the door again.

When he returned, Kayla R. suggested sex. He did not respond, but shut the door, started to drive, and told her to duck down. He parked in an area near several industrial buildings. At the time she felt trapped and obligated to have sex with him, but did not mind because she did not want to go to jail. He removed her handcuffs, exposed his penis, and said it was his "first time doing . . . something like this," and she fellated him twice. They then had intercourse without a condom. He ejaculated, but told her she would not get pregnant because he had had a vasectomy, so she did not mind.

Afterward, he asked if she wanted to see him again, and she said yes and gave him her phone number. She thought he was nice and it made her feel special or important to be wanted by him. They met on perhaps a dozen occasions while defendant was on duty, and had sex nearly every time they met. On these subsequent occasions, she did not feel pressured to have sex because she was not trying to avoid jail. She does not feel that she

7

was a victim; however, she did testify that she felt he was taking advantage of his position as an officer.

Defendant testified he met Kayla R. in late 2011 when he conducted a stop of two known probationers who were with her on the street at the time. When her name did not register any record in his warrant check, he challenged whether she was providing accurate information, and she told him her family lived nearby and could verify its accuracy. He drove her there, and denied any sexual contact took place. A couple of weeks later, he saw her on the street wrapped in a blanket, so he stopped to speak with her. She sat in the back of the patrol car, with the door open, while they talked because it was cold. During that encounter, he found a methamphetamine pipe on her, so he counseled her about the dangers of drugs. After they talked, he drove her to her friend's house. She gave him her phone number and told him to "call her sometime." He denied there was any sexual contact on that occasion. Their third encounter was initiated by his phone call to her, which resulted in a consensual oral copulation. They continued to meet for approximately eight months, always while he was on duty, and mostly involving an act of oral copulation. He stopped calling her when it became apparent she was telling others about their relationship, she started asking to see him when he was not working, and she started asking him to rent a room for her. He denied arresting her, denied that she pleaded with him to not take her to jail, and denied asking what she could give him so that he would not take her to jail.

The jury convicted defendant of kidnapping Kayla R. to commit oral copulation, rape, or sexual penetration (count 13), committing oral copulation against her will by threatening to use his authority as a public official (count 15), and of committing rape against her will by threatening to use his authority as a public official (count 16).

8

***Karen N.*** (***Counts 19-24***)

Karen N. testified that she had four interactions with defendant. On the first occasion, in either December 2011 or January 2012, defendant and another officer responded to a call about her disruptive behavior at her friend's apartment. She was intoxicated, screaming, and hitting the walls. Karen N. left the apartment voluntarily, and the friend gave defendant Karen's hat to return to her. After she left the apartment, either with defendant or on her own, Karen N. found herself in an unknown location, possibly handcuffed, in the back of a patrol car with defendant directing her to crawl out of the backseat, get on her knees, close her eyes, and turn around. When she complied, she found she was facing the officer's exposed penis. Finding herself "caught between a rock and a hard place," not wanting him to kill or to hurt her and wanting to be set free, she performed oral copulation on the officer. Afterwards, she stood up, looked at his name tag, and heard him tell her, "now everything Mr. Alvarez does is a secret."

A few months later, when she was almost at her door after a night of recycling, she heard a car approach her from behind. She ran into her motel room, but before she could close the door, defendant entered and followed her into her bathroom. He ordered her onto her knees, unzipped his pants, asked if she "want[ed] to do something," and then forced her to fellate him. She was frightened. When he was finished, he left.

On the third occasion, Karen N. had just forced her boyfriend to leave her motel room when defendant knocked on the door. Though she sat in her room with the lights off without making any noise, defendant kept knocking on the door. She was nervous. Defendant said, "Karen, if you don't open the door, I have to go get a key and open it." Realizing he was not going to leave, she opened the door. He came into the room, closed her window, asked her if she "wanted to do something," exposed his penis, and directed her to get on her knees. She became ill and vomited in the garbage can, but he did not

9

care. She did not want to have sex with defendant but, to make him leave, she orally copulated him, and briefly had intercourse with him.

Their fourth interaction occurred when he approached her in his patrol car around 2:00 or 3:00 a.m. as she was walking out of a motel. On this occasion, she was "a little bit high" on methamphetamine. He asked if she wanted a ride. She asked if he was going to drive her home and got in the backseat of the car. Instead of taking her home, he drove to a nearby alley. He looked at her, told her they could not have sex, though she had not asked him to have sex with her, asked her if she "want[ed] to do something," unzipped his pants, and directed her to get on her knees. In an attempt to make it easier for herself, she "played with him . . . and started kissing him and told him he was cute." Not knowing what else she could do, she complied and orally copulated him for "a second," and then she got up and ran away.

Defendant testified he first met Karen N. long ago when he arrested her on a domestic violence charge or warrant. He did recall escorting her from her friend's apartment one night when she was intoxicated and causing a disturbance. The friend found a hat belonging to Karen N. after she had left, and defendant agreed to take it to her. He found her walking nearby, returned her hat to her, and offered her a ride. Not handcuffed, she got into the backseat and told defendant her friend was upset with her because she "would not give it up to him." But, she implied she would engage in sexual conduct with defendant. He asked if she wanted to go somewhere to talk about it more, and she said she did. He drove to a vacant area, parked, and let her out of the car. She began to undress. Defendant told her he did not want that, but asked if she would give him oral sex. She fellated him. About a month later, he saw Karen N. walk past his parked patrol car. He greeted her and asked "if she remembered what happened last time." She responded that she did, that "it was kind of crazy, but she liked it." He asked if she would be willing to do it again. She assented, and he unlocked the door so she

10

could get into the backseat.  They drove to an alley, where he let her out of the car and she performed oral sex.  They had another sexual encounter at her motel after she waved him over when he was patrolling the area.  He entered her room, and she showed him lingerie she had hanging in her closet.  He asked if there was something she "wanted to do."  She said "yeah," and she fellated and had intercourse with him.  He recorded this encounter on a camera he carried on his person.  She was intoxicated during each of these encounters.  He denied that the fourth incident Karen N. recounted ever took place, and denied he had any sexual contact with her in her bathroom.

The jury convicted defendant of committing oral copulation against the will of Karen N. by means of duress on four separate occasions (counts 19, 20, 22 and 24); of raping her by means of duress (count 21), and of kidnapping her to commit oral copulation (count 23).  The jury also sustained the allegations that, as to count 24, he had kidnapped the victim (enhancement 24a), as to counts 20, 21 and 22, defendant had committed the acts of oral copulation and rape during the course of a residential burglary (enhancements 20a, 21a, 22a), and as to counts 19, 20, 22, and 24, he had committed the same crime against multiple victims.[1]

### Rochelle G.  (*Counts 25-27*)

In late September 2012, Rochelle G. was approached by an officer in a patrol car at approximately 4:00 a.m. while she was walking in a shopping center parking lot.  (In subsequent questioning with detectives, she identified defendant as the officer in a photographic lineup and recalled that his name began with the letter "A.")  Defendant,

---

[1] The jury did not make any finding as to the multiple victim enhancement (Pen. Code, § 667.61, subd. (e)(4); undesignated statutory references are to this code) alleged in association with count 21 and informed the court as such when the verdicts were read; however, the trial court did not address this enhancement in its declaration of a mistrial as to certain counts and enhancements.  At the People's request, we exercise our authority pursuant to section 1260 to dismiss the multiple victim enhancement to count 21.

who was in uniform and wearing his gun, got out of the patrol car, shone the car's spotlight on Rochelle G., and asked her why she was on the street at that time of night. Rochelle G. informed him that she was going to use the pay phone by the grocery store located in that shopping center to call a friend. He asked if she was prostituting. After conducting a field sobriety test, defendant stated that it appeared Rochelle G. was under the influence, which she denied. He searched her, feeling inside her bra and patting her crotch and butt while she had her hands behind her head. He then placed her in the back of the patrol car and closed the door, without handcuffing her. Rochelle G. felt very uncomfortable, nervous, scared, and "stuck." Defendant ran Rochelle G.'s name through the computer in the car to check for outstanding warrants and an arrest record. He then told her she was under arrest for being under the influence of a controlled substance.

He asked her what she could do for him to let her go. She said she would not "snitch" on anyone or provide any information but promised he would not see her on the streets again at that time of night. He responded that was not what he wanted. She told him she would not proposition him because it was illegal and he was a police officer. He told her it was only illegal if she "g[o]t paid for it." She asked him to drop her at a relative's house, which he declined, stating he was "not a taxi service." They remained parked at the shopping center for a while, until she finally agreed to fellate him so that she could be released. She felt she "had to do it" because she was in the back of the patrol car and it appeared to be "the only thing that [she] could do to not go to jail."

He drove her to an alley off a nearby street, obtained her assurance that this would remain between them, and then stopped the car. He opened the back door, directed her to remain seated but to move her feet out of the car and to wipe off her lipstick. He moved closer, sought further reassurance the encounter would stay between them, unzipped his pants, and exposed his penis. Defendant said something akin to "you know you want to," to which she replied, "I don't want to." Rochelle G. was feeling "real uncomfortable,"

12

and she "wanted to run," but she knew if she did, he would take her to jail, so she proceeded to fellate him. While she was performing the oral copulation, he alternately placed his hands inside her bra and used his hands to move her head back and forth. He asked if she liked it, and she responded negatively. He ejaculated in her mouth, zipped up his pants, sought further reassurances of her confidentiality, and then he left her in the alley.

Defendant testified he did not recognize Rochelle G. and did not recall any contact with her. Additionally, he denied having any sexual contact with Rochelle G.

The jury convicted defendant of kidnapping Rochelle G. to commit oral copulation (count 25), committing oral copulation against her will by threatening to use his authority as a public official (count 26), and of committing oral copulation against her will by means of duress (count 27). The jury also sustained the allegations that as to count 27, defendant had kidnapped the victim (enhancement 27a) and had committed the same crime against multiple victims.

### Sentencing

The trial court sentenced defendant to an aggregate state prison term of 205 years to life. It imposed consecutive 25-year-to-life sentences for counts 3, 10, 20, 21, 22,[2] 24, and 27, a consecutive 15-year-to-life sentence for count 19, consecutive seven-year-to-life sentences for counts 1, 8, 13, 23, and 25 (with the terms for counts 1, 8, 23, and 25 stayed pursuant to § 654), consecutive six-year determinate sentences for counts 2, 9, 15, and 26 (with the terms for counts 2, 9, and 26 stayed pursuant to § 654), and a consecutive two-year determinate sentence (one-third the middle term) for count 16.

---

[2] The indeterminate abstract of judgment does not list the conviction for count 22 at item 1. On remand we will direct the trial court to correct the abstract by including defendant's conviction for oral copulation by duress (count 22).

## DISCUSSION

Defendant challenges the sufficiency of the evidence supporting all of his convictions, save counts 20, 21, and 22 (victim, Karen N.). As to the kidnapping convictions and enhancements, he contends there was insufficient evidence of unlawful arrest or lack of consent. As to the oral copulation and rape under threat of authority convictions, he contends there was insufficient evidence the threatened incarceration was unlawful or the oral copulation was nonconsensual. As to oral copulation by means of duress, he contends his conduct could be punished only as oral copulation under threat of authority, and that there was insufficient evidence of duress. We accept and reject these contentions to varying degrees.

Defendant also asserts various instructional errors. Namely, he claims that the trial court should have instructed on the kidnapping defense of lawful arrest and should have defined "threat" to mean a declaration or expression of intent to do an injurious and unlawful act; that a special instruction provided by the trial court erroneously permitted the jury to find a threat based only on the victim's subjective interpretation of the circumstances; and that an instruction regarding defendant's reasonable belief in a victim's consent was erroneously applied to the counts in which he was charged with oral copulation or rape under threat of authority, improperly directed the jury to conclude defendant was dishonest, and also negated his defense of consent based on a reasonable mistake of fact. We conclude the trial court did make various instructional errors, but these errors were mostly harmless.

Defendant also asserts that the trial court should have stayed his sentence on counts 15 and 16 pursuant to section 654, and that the sentences it imposed in counts 1, 8, 13, 23, and 25 were unauthorized. As to those assertions, we agree, though we do not modify the sentence as to count 23 because we reverse it on other grounds as stated herein.

14

## 1.0    Sufficiency of the Evidence

Defendant contends his convictions for all counts, except counts 20, 21, and 22, and all kidnapping enhancements must be reversed because they are supported by insufficient evidence.  With respect to the kidnapping counts and enhancements, he contends he did not kidnap the victims—either because they consented to riding in his patrol car or because he had lawfully arrested them.  With respect to the convictions for oral copulation or rape under threat of authority, defendant contends he did not threaten any unlawful conduct as required to sustain the convictions because he had lawfully arrested the victims.  With respect to the convictions for oral copulation or rape by means of duress, defendant alternately contends there was no duress because the sexual contact was consensual or there was no requisite threat of " 'force, violence, danger, or retribution.' "  (§ 261, subd. (b).)  We conclude insufficient evidence supports defendant's convictions for counts 19, 23, 24 (Karen N.), and 27 (Rochelle G.).

In considering a claim challenging the sufficiency of the evidence to support a conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' "  (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104.)  We presume the existence of facts that can be reasonably deduced from the evidence in support of the judgment.  (*Ibid.*)  However, "a jury may not rely upon unreasonable inferences, and . . . '[a]n inference is not reasonable if it is based only on speculation.' "  (*People v. Hughes* (2002) 27 Cal.4th 287, 365.)  In this review, we do not resolve credibility issues or conflicts in the evidence de novo.  (*People v. Jackson* (2014) 58 Cal.4th 724, 749.)  Reversal is not warranted unless there is no hypothesis on which there exists substantial evidence to support the conviction.  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  We apply the same test where sufficiency of the evidence of a sentencing enhancement is challenged.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 225.)

### 1.1 Aggravated Kidnapping and Kidnapping Enhancements[*]

Defendant contends there is insufficient evidence to support a finding that he kidnapped the victims, for purposes of either the aggravated kidnapping convictions or the kidnapping sentencing enhancements, because in each instance either (1) the victim consented to the movement, even if that consent was obtained by fraud or deceit, or (2) the victim was under lawful arrest at the time of the movement. We conclude substantial evidence supports the kidnapping conviction and enhancement as to some victims but not as to others.

To be convicted of aggravated kidnapping, as defendant was in counts 1, 8, 13, 23, and 25, he must have "kidnap[ped] or carrie[d] away" another to commit rape, oral copulation, or any other specified offense, where "the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(1), (2).) Similarly, the kidnapping sentencing enhancement for counts 3 and 10 require that in the commission of rape or oral copulation by means of duress, among other enumerated crimes, "[t]he defendant kidnapped the victim . . . and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense . . . ." (§ 667.61, subd. (d)(2); see *id.*, subd. (c)(1) & (7).) Thus, unsurprisingly, both the aggravated kidnapping convictions and the kidnapping sentencing enhancements require the jury to find that defendant kidnapped the victims.

As pertinent here, section 207, subdivision (a) defines "kidnapping" as "forcibly, or by any other means of instilling fear, steal[ing] or tak[ing], or hold[ing], detain[ing], or arrest[ing] any person in this state, and carr[ying] the person into another country, state, or county, or into another part of the same county . . . ." Thus, kidnapping requires the

---

[*] See footnote, *ante*, page 1.

asportation of the victim accomplished by force or instilling fear. (*People v. Majors* (2004) 33 Cal.4th 321, 326 (*Majors*).) This does not require physical compulsion. (*Id.* at pp. 326-327.) Rather, where the victim reasonably feels compelled under the circumstances to comply with the defendant's orders under fear of harm or injury from the defendant, the asportation is forcible. (*Id.* at p. 327.) Moreover, asportation accomplished by threat of arrest "carries with it the threat that one's compliance, if not otherwise forthcoming, will be physically forced." (*Id.* at p. 331.) Thus, the threat of arrest carries with it an implicit use of force necessary for a kidnapping conviction. (*Ibid.*) In contrast, where the perpetrator tricks the victim into the asportation by fraud, deceit, enticement, or false promises, without application of the requisite force or fear, there is no kidnapping. (*Majors,* at pp. 327-328.)

Additionally, where a victim consents to the movement, meaning he or she exercises his or her free will in the absence of threats, force, or duress, there is no kidnapping. (See *People v. Sattiewhite* (2014) 59 Cal.4th 446, 476-477 (*Sattiewhite*).) However, even where a victim's initial cooperation is obtained without force or fear, a kidnapping occurs if the accused subsequently compels the victim to accompany him. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1017 [where victim voluntarily accepted ride with the defendant, that voluntariness is vitiated when the defendant does not let the victim out of the car]; accord, *People v. Thompson* (1967) 252 Cal.App.2d 76, 87-88 [movement is not consensual where victim agrees to follow robber upstairs, stops midway up the stairs to look at relatives below, and continues only after robber waves gun and says "Come on, come on"].)

Further, the criminal kidnapping statute does not apply "[t]o any person acting under Section 834 . . . ," which defines a lawful "arrest" as "taking a person into custody, in a case and in the manner authorized by law." (§§ 207, subd. (f)(2), 834.) An arrest requires " '(1) taking a person into custody; [and] (2) actual restraint of the person or his

17

[or her] submission to custody.' " (*People v. Boren* (1987) 188 Cal.App.3d 1171, 1177.) An officer may arrest a person if that person has an outstanding warrant or, in the absence of a warrant, where the person to be arrested has committed a public offense in the officer's presence, or the officer has probable cause to believe the person to be arrested has committed a felony. (§ 836, subd. (a)(1), (3).) Whether an officer has probable cause to effectuate an arrest is an objective standard, and the " 'secret intentions, hopes, or purposes' " of the arresting officer are not relevant to the legality of the arrest. (*Levin v. United Air Lines, Inc.* (2008) 158 Cal.App.4th 1002, 1018; see *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1266-1267 [the arresting officer's ulterior motives do not invalidate behavior that is otherwise objectively reasonable pursuant to the Fourth Amendment].) Additionally, "probable cause is not vitiated and an arrest remains valid even if the officer purports to arrest the person for the wrong crime." (*Johnson v. Lewis* (2004) 120 Cal.App.4th 443, 452.)

Again, section 207, subdivision (f)(2) provides for the application of the lawful arrest defense to a "person *acting under* Section 834 [defining a legal arrest] . . . ." (Italics added.) Based on the plain language of the statute, once a person is no longer *acting* to effectuate a legal arrest, the protection from criminal liability otherwise afforded is lost. Just as the defense afforded by a victim's initial consent may be vitiated by a subsequent withdrawal of that consent (*People v. Hovarter*, *supra*, 44 Cal.4th at pp. 1017-1018), we conclude that changing circumstances may limit a defendant's ability to rely on a lawful arrest as a defense to a kidnapping charge. Thus, while an officer is transporting someone pursuant to a lawful arrest, he is not kidnapping the arrested person; however, once the transportation is no longer for lawful law enforcement objectives, it may transmute into a kidnapping.[3]

---

[3] We are not persuaded by defendant's assertion that he is immunized from prosecution for kidnapping or any lesser included offense based on his lawful arrest of the victims

18

### 1.1.1   Terri G. (Count 1 and Enhancement 3a)[*]

Defendant contends his conviction for the aggravated kidnapping of Terri G. (count 1) and the kidnapping enhancement applied to his conviction for oral copulation by means of duress (enhancement 3a) must be reversed because she was subject to a lawful arrest when she was transported in defendant's patrol car.  We disagree.

To convict defendant of kidnapping, the jury had to necessarily reject defendant's testimony that Terri G. was not in his patrol car.  Thus, it must have at least partially accepted Terri G.'s testimony, which was that by the time defendant restrained Terri G. by placing her in the backseat of the patrol car and closing the door, he knew she had an outstanding warrant.  That would provide defendant probable cause to arrest her.  (See § 836, subd. (a)  ["A peace officer may arrest a person in obedience to a warrant"].)  Thus, this would appear to be a case in which an arrest was authorized by the law.  Additionally, despite the fact defendant returned Terri G.'s purse to her and did not handcuff her, there is nothing about the manner in which defendant effected the arrest

---

pursuant to section 847.  Section 847 applies as a bar to *civil* liability.  (§ 847, subd. (b).)  The inclusion of the phrase "cause of action" in this section does not, contrary to defendant's argument, make that statute applicable to criminal liability.  Each of the examples proffered by defendant as authority for the phrase "cause of action" denoting criminal counts is inapposite.  Penal Code section 298, subdivision (c)(2), Health and Safety Code section 25984, subdivision (b)(1), Government Code section 8655.5, subdivision (c)(1), and Business and Professions Code section 11021 all specifically provide a "civil *or criminal*" (italics added) modifier to the term "cause of action" to indicate that a criminal claim is effected.  Section 847 does not include any such modifier.  Instead, it states, "[t]here shall be no civil liability . . . and no cause of action shall arise . . . ."  (§ 847, subd. (b).)  Additionally the two criminal cases cited by defendant wherein a cause of action is mentioned involve a discussion of the general concepts of res judicata and collateral estoppel; they do not involve an interpretation of section 847.  (See *People v. Sims* (1982) 32 Cal.3d 468, 477, fn. 6; see also *People v. Damon* (1996) 51 Cal.App.4th 958, 968.)  Indeed, defendant has not cited any cases, nor have we found any, in which section 847 has applied to immunize a peace officer from criminal liability.

[*]  See footnote, *ante*, page 1.

that violates constitutional norms. However, after arresting Terri G., defendant told her she did not have to go to jail despite her warrant, pointedly asked if she was a prostitute, and when she responded that she had done things of which she was not proud and would not want to do again, he told her she "knew what to do and to lay down." She was frightened and did not know what else to do, so she complied. He drove the car to an alley, where he opened the car door and directed her to perform oral sex. At the point at which defendant began to offer an alternative to jail while driving the patrol car, he was not "acting under" a lawful arrest but to pursue his own prurient interests. Accordingly, there is substantial evidence to support a finding that the lawful arrest defense did not apply to absolve defendant of criminal liability.

### 1.1.2 Anna B. (Count 8 and Enhancement 10a)[*]

Defendant contends his conviction for the aggravated kidnapping of Anna B. (count 8) and the kidnapping enhancement applied to his conviction for oral copulation by means of duress (enhancement 10a) must be reversed because she was subject to a lawful arrest when she was transported in defendant's patrol car and she consented to being transported in the car, even if the asportation was by fraud or deceit. We disagree.

According to both Anna B.'s and defendant's testimony, Anna B. entered the rear seat of defendant's patrol car voluntarily based on his promise that he would take her to a store to purchase a cell phone charger. Thus, Anna B.'s initial consent appears to have been voluntarily given, without the threat of arrest, even if it was premised on a fraudulent promise by defendant. However, she further testified that they drove to a second location, where he stopped the car to run her information, seemingly to find something to use as leverage against her. At that point, she began to plead with him to let her go and cried. He refused to release her. Instead he drove to a third and more remote location, where he directed her to perform oral sex. By then her consent had been

---

[*] See footnote, *ante*, page 1.

20

vitiated by defendant's refusal to release her at the second location. Thus, there is substantial evidence to support the jury's finding that Anna B. did not consent to the movement.

At some point during their conversation at the second location, Anna B. divulged to defendant that she was under the influence of heroin. However, defendant testified that when he *first* encountered Anna B. she did not appear to be intoxicated or under the influence of any narcotic. Because being under the influence of the narcotic, as opposed to its possession, is only a misdemeanor offense, defendant lacked probable cause to arrest Anna B. unless she committed that offense in his presence. (Pen. Code, § 836; Health & Saf. Code, § 11550.) However, even assuming defendant did lawfully arrest Anna B., there is substantial evidence to support a finding that the lawful arrest defense did not apply where defendant transported Anna B. from the second location to an isolated area so they could talk in private despite her request to be taken to jail, where he made comments to induce her to solicit him while driving, and where, on arriving at the final location, he implied he wanted sexual contact with her. During the course of this asportation, there is substantial evidence to support a finding that even if defendant had lawfully arrested Anna B. at one time, he was no longer "acting under" that arrest when he drove her to an isolated area so that she could satisfy his prurient interests. Therefore, neither count 8 nor enhancement 10a are to be reversed for a want of evidence.

### 1.1.3  Kayla R. (Count 13)[*]

Defendant contends his conviction for the aggravated kidnapping of Kayla R. (count 13) must be reversed because she was subject to a lawful arrest when she was transported in defendant's patrol car and she consented to being transported in the car. We disagree.

---

[*]  See footnote, *ante*, page 1.

21

According to Kayla R.'s testimony, she did not enter the patrol car until after defendant had patted her down, found a methamphetamine pipe in her possession, placed her in handcuffs, and directed her to sit in the backseat. She was, therefore, subject to a lawful arrest when she entered defendant's patrol car. Nonetheless, after other officers left the scene, defendant opened the door, asked Kayla R. why he should not take her to jail, and prodded her to offer him something, leaving her in the locked rear compartment to "think." Thereafter, once she offered him sex, he told her to duck down and he drove her to an area near some industrial buildings, where she orally copulated him. This is substantial evidence to support a finding that during his transportation of Kayla R., defendant was no longer "acting under" a lawful arrest and is not entitled to the protection of that defense.

According to defendant, Kayla R.'s testimony shows she made the voluntary decision to go with defendant to have sex rather than go to jail. Kayla R. did testify that she offered to have sex with defendant, that defendant then began driving, and while they drove defendant and Kayla R. talked about what would be "a good place to go to do that." Defendant argues this is evidence of positive cooperation in act or attitude pursuant to an exercise of free will, thereby constituting consent. (See *Sattiewhite*, *supra*, 59 Cal.4th at pp. 476-477.) Were we to look at that evidence alone, we might agree with defendant's assessment.

However, Kayla R. also testified that defendant had handcuffed her, placed her in the backseat of the patrol car, and left her there while he spoke with other officers. After the other officers left, he asked why he should not take her to jail and what she had to offer him. When she refused to provide him any information, he shut the door again, and left her to think. For purposes of kidnapping, one has not consented unless acting "freely and voluntarily and not under the influence of threats, force or duress . . . ." (*People v. Davis* (1995) 10 Cal.4th 463, 517.) Thus, "the concepts of consent and force or fear with

22

regard to kidnapping are inextricably intertwined." (*Majors*, *supra*, 33 Cal.4th at p. 331.) Therefore, where there is a threat of arrest, there is also an implied threat that a failure to comply will result in the application of physical force, thereby undermining the victim's free will in any assessment of consent. (*Ibid.*) Here, Kayla R. was under arrest at the time she purportedly consented to go with defendant, already handcuffed and sitting in the rear seat of his patrol car. Therefore, there is substantial evidence to support a finding that she did not consent to go with defendant.[4]

### 1.1.4 Karen N. (Count 23)[5]

Defendant contends his conviction for the aggravated kidnapping of Karen N. (count 23) must be reversed because she consented to being transported in the patrol car, even if the asportation was by fraud or deceit. We agree.

By their fourth interaction, defendant had raped Karen N. and had forced her to orally copulate him on multiple occasions. Thus, it is theoretically possible, as the People argue, that Karen N. was afraid of defendant based on their past interactions. Nonetheless, Karen N.'s testimony does not establish that her will was overcome by fear when she got into the car voluntarily, thinking defendant was going to drive her home when he offered her a ride. Nor are we persuaded that Karen N.'s question to defendant, "are you really going to give me a ride home?" before getting into his car, is substantial evidence to support a conclusion that her consent was not voluntarily given. Even if she did doubt *where* defendant was going to take her that does not render her decision to enter the car involuntary.

---

[4] For the same reasons, we do not find any error in the trial court's denial of defendant's motion for acquittal as to count 13. (See *People v. Stevens* (2007) 41 Cal.4th 182, 200.)

[5] In light of our conclusion in section 1.3.3, *post*, at page 36, that insufficient evidence supports defendant's conviction for oral copulation by means of duress in count 24, we do not address his contention that insufficient evidence supports the sentencing enhancement in count 24a. (See § 667.61, subd. (a).)

23

Thus, even though defendant drove her to an alley instead of home, there is no evidence that Karen N. resisted being transported in defendant's car in any way or that defendant asserted any force or threat to cause Karen N. to get in the car. On this evidence, despite the fact that Karen N.'s consent to enter the patrol car and to be transported by defendant was obtained by deceit, there is insufficient evidence to support a finding that it was not voluntarily provided. (*Majors*, *supra*, 33 Cal.4th at pp. 327-328; *People v. Stephenson* (1974) 10 Cal.3d 652, 659-660.) Therefore, defendant's conviction for count 23 must be reversed.[6]

### 1.1.5 Rochelle G. (Count 25)[7]/[*]

Defendant contends his conviction for the aggravated kidnapping of Rochelle G. (count 25) and the kidnapping enhancement applied to his conviction for oral copulation by means of duress (enhancement 27a) must be reversed because she was subject to a lawful arrest when she was transported in defendant's patrol car and she consented to being transported in the patrol car. We disagree.

As noted above, an arrest is not lawful where it is not conducted in a manner authorized by law. (§ 836.) Here, in searching Rochelle G. following her field sobriety test, defendant felt her breasts inside her bra and patted her crotch and butt, making Rochelle G. feel very uncomfortable. Defendant was authorized only to conduct a search

---

[6] In light of this conclusion, we do not address defendant's contention that the abstract of judgment on count 23 must be corrected to reflect that he was convicted of aggravated kidnapping to commit oral copulation and not "Oral cop by duress," as currently indicated. Nor do we address whether the trial court committed a sentencing error as to this count.

[7] In section 1.3.2, *post*, at pages 31 to 33, we conclude there is insufficient evidence to support defendant's conviction for oral copulation by means of duress in count 27. Therefore, we do not address the sufficiency of the evidence to support enhancement 27a, because it cannot stand in the absence of an associated conviction. (See § 667.61, subd. (a).)

[*] See footnote, *ante*, page 1.

incident to arrest, which, subject to limitations, authorizes an officer "to search an arrestee's person, personal property, or vehicle for evidence of crime in order to prevent its concealment or destruction" (*People v. Tom* (2014) 59 Cal.4th 1210, 1247) or to protect officer safety where there is reason to believe the suspect is armed (see *Riley v. California* (2014) ___ U.S. ___, ___ [189 L.Ed.2d 430, 440]).  Here, there was nothing to indicate Rochelle G., whom defendant arrested for being under the influence of a narcotic, was armed or that she would be able to conceal or destroy evidence of her crime with anything inside her bra, vagina, or buttocks.  Therefore, defendant's search of Rochelle G. was unreasonable and her arrest was not conducted in a manner authorized by law.  Accordingly, there is substantial evidence to support a finding that the lawful arrest defense did not apply.

Rochelle G. testified she did not enter defendant's car until after he directed her to do so (after he shone a spotlight on her, accused her of prostituting, conducted field sobriety tests, accused her of being under the influence of drugs, and improperly searched her).  This is substantial evidence to support the jury's finding that Rochelle G. did not enter the car consensually.  (*Majors*, *supra*, 33 Cal.4th at p. 331.)  Thereafter, while she remained locked in the rear compartment of the patrol car, defendant refused her request to take her to her relative's house and refused to release her on her promise not to be on the streets at that time of night again.  Based on the circumstances and the victim's custodial status, it would be reasonable for a jury to conclude that Rochelle G. did not consent to the movement, despite agreement to orally copulate defendant, because she could not leave and defendant had already demonstrated that he would not release her or take her where she wanted to go.  (See *Sattiewhite*, *supra*, 59 Cal.4th at pp. 476-477 [consent requires "an exercise of 'a free will' " and "that the consenting person . . . 'act[s] freely and voluntarily and not under the influence of threats, force, or duress' "].)

25

Therefore, there is substantial evidence to support the finding that Rochelle G. did not consent to the movement.  [END OF PUB. PT. OF DISCUSSION]

### 1.2  Rape and Oral Copulation Under Threat of Authority

Defendant contends there is insufficient evidence to support his convictions for rape or oral copulation under threat of authority (§§ 261, subd. (a)(7), 288a, subd. (k)) in counts 2, 9, 15, 16, or 26, because he did not *unlawfully* threaten incarceration, arrest, or deportation.  We disagree.

The statutes at issue here require the perpetrator to commit the sexual intercourse or oral copulation "against the victim's will by threatening to use the authority of a public official to incarcerate, arrest, or deport the victim . . . ."  (§§ 261, subd. (a)(7), 288a, subd. (k).)[8]  Had the Legislature intended sections 261, subdivision (a)(7) and 288a, subdivision (k) to require a threat only of an *unlawful* incarceration, arrest, or deportation, it certainly could have so stated.  But it did not, and we decline to read such a requirement where the Legislature has not provided it.  (*People v. Leal* (2004) 33 Cal.4th 999, 1008 (*Leal*) [in construing a statute, we do not " ' "insert what has been omitted" ' "].)

Moreover, contrary to defendant's assertion, though *many* statutes make the criminality of a threat dependent on the unlawful nature of the act threatened, not *all* do. [9]

---

[8]  These sections stand in contrast to section 289.6, subdivision (a)(2), which provides that "a peace officer who engages in sexual activity with a *consenting* adult who is confined in a detention facility is guilty of a public offense."  (Italics added.)

[9]  For example, section 71, subdivision (a) makes it a crime to prevent or attempt to prevent a school or public officer or employee from fulfilling his or her duties "by means of a threat . . . to inflict an unlawful injury"; section 76, subdivision (a) makes it a crime to "knowingly and willingly threaten[] the life of, or threaten[] serious bodily harm to" public officials; section 137, subdivision (b), defines the requisite "threat of force" necessary to be convicted of inducing false testimony as a "threat of unlawful injury"; sections 261, subdivision (a)(6) and 288a, subdivision (*l*) define a threat of "retaliat[ion]" as a basis for a rape or unlawful oral copulation conviction as "a threat to kidnap or

The crime of extortion, for example, permits a jury to find the fear necessary to sustain a conviction based on a threat by the defendant to accuse the victim or a relative of a crime; to expose or impute to the victim a deformity, disgrace, or crime; to expose a secret affecting the victim; or to report the immigration status or suspected immigration status of the victim. (§ 519, subds. 1-5.) While these threatened acts are not unlawful per se, when a person issues these threats in an effort to obtain property or an official act, it is a crime. (§§ 518, 523; see, e.g., *Mendoza v. Hamzeh* (2013) 215 Cal.App.4th 799, 805 ["[t]he threat to report a crime may constitute extortion even if the victim did in fact commit a crime"]; see also *People v. Peniston* (1966) 242 Cal.App.2d 719, 723-724 [permitting conviction for criminal extortion where the defendant threatened to show partially nude photographs of the victim to her husband and parents].) Similarly here, regardless whether the threatened arrest or incarceration was lawful, it is illegal to threaten those acts to induce a victim to engage unwillingly in sexual intercourse or oral copulation with a defendant. Therefore, we do not address defendant's contention that there was insufficient evidence he threatened any unlawful act. As that is the only contention defendant raised with respect to the sufficiency of the evidence supporting counts 2 (Terri G.) and 9 (Anna B.), we conclude those counts are supported by substantial evidence.

We next turn to defendant's contention that as to Kayla R. and Rochelle G., there is insufficient evidence the sexual act was nonconsensual to support his convictions in

---

falsely imprison, or to inflict extreme pain, serious bodily injury, or death"; section 422, subdivision (a) makes it unlawful to "willfully threaten[] to commit a crime"; and section 519, subdivision 1 provides that a threat "[t]o do an unlawful injury" to a person or property may provide sufficient fear to constitute an extortion. We also acknowledge that to protect First Amendment rights, the use of the term threat in section 69, which prohibits a person from deterring an officer by threat or violence, has been interpreted to mean a threat of unlawful violence. (*In re Manuel G.* (1997) 16 Cal.4th 805, 814-815.)

counts 15, 16, and 26. We conclude substantial evidence supports the jury's implicit findings that Kayla R. and Rochelle G. did not consent to the sexual acts.

For purposes of rape under threat of authority, "consent" means "positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (§ 261.6.) We see no reason to apply a different definition for purposes of the oral copulation under threat of authority. Here, Kayla R. had been handcuffed, threatened with jail, and then taken to a remote location. She did not offer to have sex with defendant until after he had arrested her, handcuffed her, confined her, and left her to think more when she refused to provide information. By not taking her to jail or releasing her when she refused to offer something in exchange, defendant had already demonstrated he would continue to apply threats and pressure when he did not get what he wanted. Kayla R. testified she felt trapped and obligated to have sex with defendant to avoid jail. On this evidence, though it is balanced, we conclude a jury could reasonably find Kayla R. had not consented to the sexual acts for purposes of counts 15 and 16.[10]

Rochelle G. did not agree to fellate defendant in exchange for her release until after defendant had already searched her improperly, confined her in the patrol car, rejected the promise she offered in exchange for being released, refused to drive her to a relative's house, and suggested it would only be illegal for her to proposition defendant if he paid her. Even when he drove her to an alley and exposed his penis, she informed him she did not want to fellate him. She further testified she was uncomfortable and wanted to run or resist, but felt she "had to do it" and that if she did not, defendant would take her to jail and no one would believe her. Rochelle G. plainly did not want to fellate

---

[10] For the same reasons, we find no error in the trial court's denial of defendant's motion for acquittal as to counts 15 and 16. (See *People v. Stevens*, *supra*, 41 Cal.4th at p. 200.)

28

defendant.  Therefore, there is substantial evidence to support a finding that the oral copulation charged in count 26 was nonconsensual.

### 1.3   Oral Copulation by Means of Duress

Defendant contends there is insufficient evidence to support his convictions for oral copulation by duress in counts 3, 10, 19, 24, and 27.  Section 288a, subdivision (c)(2)(A) provides that "[a]ny person who commits an act of oral copulation when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . " has committed a criminal act.  Defendant was charged specifically as having violated this section by means of duress only; therefore, we limit our review to determine if there is substantial evidence to support the convictions pursuant to that theory.  (*People v. Kunkin* (1973) 9 Cal.3d 245, 251.)  For purposes of this section, "duress" is a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. (*Leal*, *supra*, 33 Cal.4th at pp. 1005, 1009-1010.)

### 1.3.1   Application of the *Williamson* Rule

First, we address defendant's contention that, pursuant to *In re Williamson* (1954) 43 Cal.2d 651, 654-655, his convictions for oral copulation by duress in counts 3, 10, and 27, cannot stand because they are based on his threats to bring Terri G., Anna B., and Rochelle G. to jail, which conduct is specifically punishable under section 288a, subdivision (k).  As we explain below, we conclude section 288a, subdivision (k) is a more specific statute preventing prosecution under section 288a, subdivision (c)(2)(A) where the only threatened conduct is arrest, incarceration, or deportation.

Where a specific statute prohibits the same crime as a more general statute, the court will infer a legislative intent that the crime be punished only under the specific

29

statute. (*In re Williamson*, *supra*, 43 Cal.2d at pp. 654-655; accord, *People v. Jenkins* (1980) 28 Cal.3d 494, 505 ["The fact that the Legislature has enacted a specific statute covering much the same ground as a more general law is a powerful indication that the Legislature intended the specific provision alone to apply."].) "Absent some indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' " (*People v. Murphy* (2011) 52 Cal.4th 81, 86.) Thus, as explained in *Mitchell v. Superior Court* (1989) 49 Cal.3d 1230, 1250, "when the Legislature has enacted a specific statute addressing a specific matter, and has prescribed a sanction therefor, the People may not prosecute under a general statute that covers the same conduct, *but which prescribes a more severe penalty*, unless a legislative intent to permit such alternative prosecution clearly appears."

The elements of oral copulation by means of duress are (1) oral copulation, (2) accomplished against the victim's will, and (3) by means of a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act that otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. (§ 288a, subd. (c)(2)(A); *Leal*, *supra*, 33 Cal.4th at p. 1006.) The elements of oral copulation under threat of authority are (1) oral copulation, (2) accomplished against the victim's will, (3) by threatening to use the authority of a public official to incarcerate, arrest, or deport the victim or another, and (4) the victim has a reasonable belief the perpetrator is a public official. (§ 288a, subd. (k).) Thus, each of the elements of the more general crime of oral copulation by means of duress corresponds to an element appearing on the face of the more specific crime of oral copulation under threat of

30

authority, where the threat of authority is simply a specific category of threats that may be issued to constitute duress.

Additionally, violations of both statutes are generally punishable by the same sentencing triad of three, six, or eight years in state prison. (§§ 288a, subd. (c)(2)(A), (k).) However, oral copulation by means of duress is subject to harsher sentencing if the victim is a minor or if the crime is committed in conjunction with an aggravated kidnapping or first degree burglary. (§§ 288a, subds. (c)(2)(B)-(C), 667.61, subds. (c)(7), (d)(2), (4).) Thus, the two provisions do conflict. (See *People v. Artis* (1993) 20 Cal.App.4th 1024, 1026-1027 [stating the necessity of a conflict between the elements to prove, or the punishment for, the crimes codified in the statutes for purposes of the *Williamson* rule analysis].)

Therefore, to the extent that defendant's convictions for oral copulation by means of duress in counts 3, 10, and 27 are premised on conduct that would be punishable as oral copulation under threat of authority, those convictions must be reversed. If, however, there is substantial evidence of a " 'direct or implied threat of force, violence, danger, hardship, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted' " (*Leal*, *supra*, 33 Cal.4th at p. 1006, italics omitted), *other* than a threat to "incarcerate, arrest, or deport" the victim (§ 288a, subd. (k)), the convictions may be affirmed.

### 1.3.2 Sufficiency of the Evidence of Duress in Counts 3, 10, and 27

In light of our conclusion regarding the application of the *Williamson* rule, we address whether there is sufficient evidence of duress to support defendant's convictions in counts 3, 10, and 27 when we exclude evidence of a threat of incarceration. We conclude defendant's conviction for count 27 (Rochelle G.) must be reversed because there is insufficient evidence of duress when we exclude a threat of arrest, incarceration,

31

or deportation, which cannot be considered as a basis for oral copulation by means of duress due to the existence of the more specific statute penalizing oral copulation under threat of authority. However, we find substantial evidence to support defendant's convictions for oral copulation by means of duress in counts 3 (Terri G.) and 10 (Anna B.).

The fact that a victim was in custody at the time of the sexual contact is not sufficient in and of itself to show that she was coerced into consenting to the contact, nor is the fact that defendant was armed with a gun in its holster; however, these are both factors to be considered among the totality of the circumstances to determine whether there was a sufficient threat to overcome the victim's will. (See *People v. Williams* (2007) 156 Cal.App.4th 949, 961[custody alone is not sufficient to render consent to a search involuntary where officers did not draw their weapons or make an " 'overt or implied threat of force' "].) Additionally, while psychological coercion may be considered in determining whether there is evidence of duress, " ' "[p]sychological coercion" without more does not establish duress.' " (*People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1321.)

Terri G. refused to tell defendant about any drug dealers when he suggested she did not have to go to jail despite her outstanding warrant. Defendant then asked if she had ever been a prostitute and told her she "knew what [she] could do for him" and to "lie down." She complied, "[b]ecause he's a police officer and [she] didn't know what to do." She was scared because she had never had an experience like this, defendant was armed, and she did not know what was going to happen. He drove her to an alley, told her to get on her knees, and placed his penis in her mouth. She "just wanted to get out alive," so she did what he told her to do and did not resist. When he ejaculated, he had one hand around her throat and one on the back of her head, choking her. That defendant told her to lie down, indicating that he wanted to avoid suspicion or notice; that he drove

32

her to an isolated alley; that he was armed and she was in custody; that he forced his penis into her mouth; and that he ultimately put his hand around her throat, were sufficient to demonstrate at least an implied threat of force or violence, sufficient to sustain a finding of duress. Therefore, there is substantial evidence to support defendant's conviction on count 3.

Anna B. was not afraid that defendant would take her to jail, for she repeatedly asked to be taken to jail or let go, but she was afraid of something else, and she was intimidated by defendant. She did not think he would kill her but feared something "more than incarceration," and she felt she had to comply with his orders. Based on her testimony, Anna B. had cause to be afraid: She was in a strange town; it was late at night; she was alone and her cell phone battery was waning or had died when she was contacted by defendant; she felt defendant was trying to trick her into soliciting or bribing him; he drove her to a dark and remote location after she had asked to be released or taken to jail; he silenced her when the dispatcher called on the radio; and he refused to release her despite her pleas. On this evidence, a reasonable trier of fact could conclude defendant made a direct or implied threat of danger, sufficient to sustain a finding of duress to warrant a conviction for oral copulation by duress in count 10.

Unlike Terri G. and Anna B., Rochelle G. did not testify that she was afraid of what defendant would do to her. Instead, her testimony evinced her sole motivation in fellating defendant was to avoid going to jail. As she said, she "felt like [she] had to do what [she] had to do so that [she] didn't have to go to jail that night." In the absence of any evidence that Rochelle G. engaged in the oral copulation for any reason other than a threat of jail, defendant's conviction for oral copulation by duress in count 27 cannot stand. Here, there is no such evidence. Therefore, we reverse defendant's conviction for count 27 based on insufficient evidence of duress.

33

### 1.3.3  Sufficiency of the Evidence of Duress in Counts 19 and 24

Defendant also challenges the sufficiency of the evidence for counts 19 and 24 (Karen N.), claiming, with respect to count 19, there was no evidence he made an express or implied threat of force, violence, danger, hardship, or retribution, and with respect to count 24, there was no evidence of a "direct or implied threat of force, violence, danger, or retribution" that overcame Karen N.'s will to refuse the oral copulation.  We address these two counts separately because the conduct was not also punished by a conviction based on a threat of arrest, incarceration, or deportation.  Nonetheless, the *Williamson* rule still applies, so where the evidence demonstrates the threatened conduct, independent of any threat of arrest, incarceration, or deportation, is insufficient to sustain a finding of duress, the conviction must be reversed.  We conclude neither conviction is supported by substantial evidence.

As to the first incident, charged as count 19, there is no evidence of any direct or implied threat of force, violence, danger, hardship or retribution.  The People argued Karen N. was afraid of defendant because she was drunk, it was cold outside, she had no means of transportation to her motel room other than a ride from defendant, she could not remember where she was or what happened prior to finding herself in defendant's car, and she gave defendant oral sex because she wanted to "set [her]self free" and she did not want defendant to hurt her.  But, Karen N. testified that she asked defendant for a ride after the person she was staying with kicked her out of his apartment.  The next thing she remembered was being on the sidewalk giving defendant oral sex.  She vaguely recalled being told to "crawl out of the backseat," to "get on [her] knees," to "close [her] eyes," and to "turn around."  She complied and his penis was directly in front of her face.  When he asked, "you want this?" she began to fellate him without saying anything.  She may have been handcuffed but, as discussed above, even if she was in custody, that in and of itself is not sufficient to demonstrate coercion, especially where she could not remember

34

defendant saying anything else to her. (See *People v. Williams*, *supra*, 156 Cal.App.4th at p. 961.)

Additionally, though Karen N. felt she was "caught between a rock and a hard place," and that she orally copulated him because she "wanted to set [her]self free, and [she did not] want this guy to hurt [her]," and she "thought maybe he was going to shoot [her] execution style for no reason whatsoever," she also acknowledged that her "mind kind of goes to drastic extremes." "Under some circumstances a conviction [premised on a theory of 'fear of immediate and unlawful bodily injury' (§ 288a, subd. (c)(2)(A))] can be sustained even where the victim entertains an unreasonable fear of the assailant, if the assailant knows and takes advantage of the unreasonable fear." (*People v. Bermudez* (1984) 157 Cal.App.3d 619, 625.) But here, there is no evidence that defendant was aware of Karen N.'s fear, nor was defendant charged with oral copulation by means of "fear of immediate and unlawful bodily injury." (§ 288a, subd. (c)(2)(A); see *People v. Kunkin*, *supra*, 9 Cal.3d at p. 251 [in a substantial evidence analysis, we do not consider theories not before the jury].) Therefore, her fear of being shot, in the absence of some direct or implied threat that defendant would shoot her, is not relevant to this inquiry. And there was no evidence defendant threatened to shoot her, or even that he unholstered his service weapon.

On these facts, there is insufficient evidence to support a finding of duress with respect to this first incident. Therefore, we must reverse defendant's conviction in count 19 for oral copulation by means of duress.

Defendant also contends there is insufficient evidence to support his conviction for oral copulation by means of duress in count 24 because there was no direct or implied threat of force, violence, danger, or retribution, and there was no evidence Karen N. did not consent to the sexual contact. The People argue the jury could have found an implied threat of force or retribution based on the three prior incidents between defendant and

35

Karen N. in which defendant asked Karen N. if she "want[ed] to do something" just before ordering her onto her knees and placing his penis in her mouth.

As noted above, the fourth incident was initiated when defendant offered to give Karen N. a ride home, and she got into the patrol car, even though she asked if he was "really" going to take her home. She could not explain how she ended up on her knees in an alley instead—she suggested "Maybe I was accustomed to it. I don't know. Maybe he said it. I don't know." But she did recall that she began to "play[] with him" by kissing him and telling him he was cute to make it easier on herself. She put her mouth on his penis momentarily and then ran away, but she returned to collect her sunglasses when defendant shouted that she had forgotten them. There was no evidence that he tried to stop her or that he followed her.

Though the history between defendant and Karen N. could certainly color the interpretation of this incident, there was simply no evidence that defendant even impliedly threatened any force, violence, danger, hardship, or retribution would befall Karen N. if she did not orally copulate him on this occasion, nor was there any evidence she resisted or otherwise did not consent to the sexual contact. Accordingly, we must reverse defendant's conviction for oral copulation by means of duress in count 24 for insufficient evidence.

## 2.0 Instructional Errors

Defendant claims the trial court erred in failing to instruct the jury sua sponte on the defense of lawful arrest. We conclude any error by the trial court in failing to provide such an instruction was harmless.

Defendant also contends it was error for the trial court to fail to provide a definition of the term "threat." We conclude the only error in this regard was failing to instruct the jury that a defendant may not be guilty of oral copulation by means of duress

36

where the direct or implied threat is a threat of arrest, incarceration, or deportation. We further conclude this error was prejudicial as to count 3 (Terri G.), and therefore reverse the judgment with respect to that count.

Defendant also contends the trial court provided an erroneous special instruction on threats that permitted the jury to find a threat based solely on the victim's subjective interpretation of the circumstances without a finding that defendant directly or impliedly issued a threat. We conclude any error in this instruction was harmless.

Defendant's final set of instructional challenges are aimed at the instruction provided regarding whether defendant could reasonably rely on a victim's consent. We conclude defendant did not suffer any prejudice as a result of any error in the instruction.

In considering a claim of instructional error, we first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (*People v. Carrington* (2009) 47 Cal.4th 145, 192.) We presume jurors are "intelligent and capable of understanding and applying the court's instructions." (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) And we do not find error unless "there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights." (*Andrade*, *supra*, 85 Cal.App.4th at p. 585.)

### 2.1 Defense of Lawful Arrest

Defendant contends the trial court prejudicially erred by failing to instruct the jury sua sponte on the lawful arrest defense to kidnapping. A trial court is not obligated to instruct on a particular defense sua sponte unless (1) it appears the defendant is relying on the defense, or (2) there is substantial evidence to support the defense and the defense is not inconsistent with the defendant's theory of the case. (*People v. Dominguez* (2006)

37

39 Cal.4th 1141, 1148.) "[W]hen the trial court believes 'there is substantial evidence that would support a *defense* inconsistent with that advanced by a defendant, the court should ascertain from the defendant whether he wishes instructions on the alternative theory.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 157 (*Breverman*).) Even assuming the trial court erred by not instructing the jury sua sponte on the lawful arrest defense to kidnapping, we conclude the error was not prejudicial.

Terri G., Rochelle G., and Kayla R. all testified that they were arrested by defendant. Anna B. testified that though she got into the patrol car consensually, she later told defendant she was under the influence of heroin and defendant responded that he could take her to jail for that. As to Terri G., defendant testified that she was not in his patrol car and they never had any sexual contact. As to Rochelle G., he testified that he had no sexual contact with her, and, further, that he did not recognize her or recall any contact with her whatsoever. As to Kayla R., defendant specifically denied arresting her and testified that when he drove Kayla R. in his patrol car it was consensual and, on the occasion that was the basis of the kidnapping conviction, so that he could drive her to a friend's house. Defendant testified he gave Anna B. a ride so she could buy a cell phone charger, that they stopped to talk when she began flirting with him, and that they drove somewhere private so she could live out a sexual fantasy.

Defendant's principal theory as to Terri G. and Rochelle G. was that they had concocted their testimony in association with Kayla R., and his alternate theory, assuming the jury believed the victims' testimony, was that no kidnapping had occurred because he had not moved them any more distance than necessary to complete the sex act, i.e., that the movement was incidental. The defense theory as to Kayla R. was that their relationship was entirely consensual. As to Anna B., the defense theory was that she was a prostitute and a liar, and their entire interaction was consensual.

38

A lawful arrest defense would clearly be inconsistent with defendant's theory that Terri G. had never been in his patrol car and that his transportation of both Kayla R. and Anna B. was consensual. However, it would not necessarily be inconsistent with his theory that he did not remember Rochelle G. Nor is it necessarily inconsistent with the theory that the asportation of Terri G. and Rochelle G. was incidental only. Therefore, in light of the evidence that these victims may have been lawfully arrested, it was likely error for the trial court to fail to provide a lawful arrest instruction sua sponte, or at least to ascertain whether defense counsel wanted such an instruction.[11] The purpose of such an inquiry is to "afford assurance that the theory has not been inadvertently overlooked by counsel," which it appears to have been here. (*People v. Sedeno* (1974) 10 Cal.3d 703, 717, fn. 7.)

That does not mean, however, that the trial court's error was prejudicial. We review the failure to instruct sua sponte on a defense under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818. (See *Breverman*, *supra*, 19 Cal.4th at p. 178; see also *People v. Elize* (1999) 71 Cal.App.4th 605, 616.) Thus, we do not reverse a conviction of a charged offense unless, " 'after an examination of the entire cause, including the evidence' [citation], it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (*Breverman*, at p. 178.) This review is distinct from a review for the sufficiency of the evidence. In a harmless error analysis, we conduct a "broader and more active consideration of the evidence. In appraising the prejudicial effect of trial court error, an appellate court does not halt on the rim of substantial evidence or ignore reasonable

---

[11] However, there is insufficient evidence to support instruction on this defense with respect to the kidnapping of Karen N. (count 23 and enhancement 24a) because there was no evidence she entered the car other than voluntarily based on defendant's fraudulent offer to drive her home.

inferences favoring the appellant." (*People v. Butts* (1965) 236 Cal.App.2d 817, 832.) We consider, among other things, the relative strength of the evidence supporting the existing judgment and that evidence supporting a different outcome to determine "that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman*, at p. 177.)

Here, there was evidence that defendant was not "acting under" that lawful arrest for the entirety of his transportation of the victims. Indeed, the victims' testimony suggests that defendant drove the vulnerable women to isolated areas—an alley, an industrial area, and a construction zone—in the middle of the night so they could provide him sexual satisfaction. Thus, the victims provide both the evidence of the arrest, which defendant generally denied by his own testimony, and the evidence of defendant's subsequent words and conduct showing he had abandoned pursuit of law enforcement objectives that may have been associated with the arrest initially to pursue his own prurient interests instead. Thus, the relative strength of the evidence supporting the existing judgments, i.e., that defendant had kidnapped Terri G., Anna B., Kayla R., and Rochelle G., and that he was not transporting them while "acting under Section 834" (§ 207, subd. (f)(2)), indicates "there is no reasonable probability" (*Breverman*, *supra*, 19 Cal.4th at p. 177) that had the jury been instructed on the lawful arrest defense he would have been found not guilty as to counts 1, 8, 13, and 25, and enhancements 3a, 10a, and 27a.[12] Therefore, any error by the trial court was harmless.

### 2.2   Threats

#### 2.2.1   Failure to Define

Defendant contends the trial court prejudicially erred with respect to all counts in failing to instruct the jury sua sponte on the meaning of the term "threat." Specifically,

---

[12] We have already reversed count 27 and its accompanying enhancement—27a—based on insufficient evidence.

he argues the jury should have been instructed that in the context of criminal law a threat is a declaration or expression of intent to do an injurious and unlawful act. We conclude the trial court did not err in failing to define the term "threat" as proposed by defendant. However, it was error, as to counts 3 and 10, for the trial court to fail to instruct the jury that defendant could not be found guilty of oral copulation by means of duress unless the jury found defendant's threat, whether direct or implied, was a threat of something other than incarceration or arrest.

"The language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language." (*People v. Poggi* (1988) 45 Cal.3d 306, 327.) A court need not "define terms that are commonly understood by those familiar with the English language, but it does have a duty to define terms that have a technical meaning peculiar to the law," i.e., where the " 'statutory definition differs from the meaning that might be ascribed to the same terms in common parlance.' " (*People v. Bland* (2002) 28 Cal.4th 313, 334.) Thus, whether an instruction is required "turn[s] not on whether the term or phrase at issue has more than one meaning, but on whether the term or phrase has a 'technical meaning peculiar to the law.' " (*People v. Forbes* (1996) 42 Cal.App.4th 599, 605.)

Defendant first contends that the legal definition of "threat" requires that he expressed intent to do something, and cannot mean he posed a threat by his presence or existence. We disagree. Here, the instructions to the jury were that to find defendant guilty of oral copulation or rape by duress, the jury had to find "a direct or implied threat of force, violence, danger, or retribution," and to find defendant guilty of oral copulation or rape under threat of authority, the jury had to find defendant "threaten[ed] to use the authority of a public office to incarcerate or arrest someone." These instructions indicate

defendant actually had to do something, whether through words or conduct, that threatened some specific action or condition, i.e., "force, violence, danger, or retribution" or "incarcerat[ion] or arrest." There is nothing to indicate "threat" or "threaten" in this context means anything more particular that a person familiar with the English language would not understand.

Additionally, we note the threat could be based on defendant's conduct, without defendant vocalizing any express threat, so he could by his presence, depending on the attendant circumstances, convey a threat sufficient to constitute duress. (See *People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1578-1580 [concluding substantial evidence to support convictions for lewd conduct with a child under the age of 14 by duress where the defendant occupied a position of authority, had a background of drinking and violence, and circumstances suggested an implied threat of harm if the victims refused to comply]; but see *People v. Espinoza, supra*, 95 Cal.App.4th at pp. 1321-1322 [defendant's lewd act was not accomplished by duress where the only showing was that he was the victim's father, he was larger than she was, she had a limited intellectual level, and she was afraid because he had molested her several times].) Defendant's citation to *People v. Jackson* (1996) 13 Cal.4th 1164, 1256 (conc. opn. of Mosk, J.) for the proposition that a threat cannot be based on his mere presence is equally unconvincing. There, Justice Mosk disagreed with Justice Baxter (also concurring) regarding whether a nonviolent escape constituted an " 'implied threat' of force or violence" for purposes of determining whether the death penalty should apply. (*Id.* at p. 1255 (conc. opn. of Mosk, J.).) Justice Mosk held that there was no threat regardless whether he accepted that a threat was " '[an] expression of an intention to inflict loss or harm on another by illegal means and esp[ecially] by means involving coercion or duress of the person threatened' " or " 'something that by its very nature or relation to another threatens the welfare of the latter,' " i.e., a crumbling cliff that threatened the village over which it loomed. (*Id.* at

42

p. 1256 (conc. opn. of Mosk, J.).) Therefore, defendant's argument that threat in this context cannot mean he posed a threat by his presence or existence is unavailing.

Nor are we persuaded that the definition of "threat" as " 'an " 'expression of an intent to inflict evil, injury, or damage on another,' " ' " as stated in *People v. Borrelli* (2000) 77 Cal.App.4th 703, 715, is controlling here. That definition is drawn from cases involving the criminalization of pure speech as threats, which necessarily requires communication of the threat through verbalization and, by extension, involves a context in which First Amendment protections come into play, thereby requiring that the threatened conduct be limited to physical violence or other unprotected speech. (See *id.* at pp. 715-717.)

We also disagree with defendant's contention that for purposes of rape or oral copulation under threat of authority there is no threat unless defendant threatened illegal arrest or incarceration. As discussed above, regardless whether the threatened arrest or incarceration is unlawful, the fact that it is threatened to induce the victim to engage unwillingly in sexual intercourse or oral copulation renders the act illegal. (See §§ 518, 523; see also *Mendoza v. Hamzeh*, *supra*, 215 Cal.App.4th at p. 805 ["[t]he threat to report a crime may constitute extortion even if the victim did in fact commit a crime"]; *People v. Peniston*, *supra*, 242 Cal.App.2d at pp. 723-724 [finding the defendant could be convicted of criminal extortion where he threatened to show partially nude photographs of the victim to her husband and parents].)

Finally, we need not address defendant's contention that with respect to rape or oral copulation by means of duress, there is no duress if the application of "force, violence, danger, or retribution" threatened is lawful. First, we have already reversed counts 19, 24, and 27 based on a lack of substantial evidence to support a finding of duress; therefore, we do not address any instructional error with respect to those counts. Moreover, to the extent we found there was substantial evidence to support a conviction

43

for oral copulation by means of duress in counts 3 (Terri G.) and 10 (Anna B.), it was based on a threat of force, violence, or danger that entailed unlawful conduct. The trial court need not provide an instruction that is not supported by substantial evidence; therefore, even if defendant is correct in his assertion that there is no duress if the application of "force, violence, danger, or retribution" threatened is lawful (an assertion we do not decide), it would not be error in this instance for the trial court to fail to provide such an instruction here.

The same is true of counts 20, 21, and 22, where the duress finding was not premised on any threat of lawful action or merely on the circumstances. Rather, the duress finding was premised on a combination of defendant's conduct and words, including for count 20: Defendant pushed his way into Karen N.'s motel room uninvited, followed her into her bathroom, ordered her onto her knees while he unzipped his pants, and forced her to orally copulate him. And for counts 21 and 22, he knocked insistently on her motel room door, indicated if she did not open the door, he would get a key and open it, then came into the room, closed the window, exposed his penis, forced her onto her knees, ignoring the fact that she was ill, and directed her to orally copulate him and then to have vaginal intercourse. There was not substantial evidence to support any instruction on lawful "threat" with respect to these counts.

However, as we explained above, pursuant to the *Williamson* rule, any conviction for oral copulation or rape by means of duress could not be based on a threat by defendant to use his authority as a peace officer to arrest, incarcerate, or deport the victims. (*In re Williamson* (1954) 43 Cal.2d 651.) Based on this conclusion, as to counts 3 (Terri G.) and 10 (Anna B.) it was error for the trial court to fail to instruct the jury that for oral copulation by means of duress, a threat of incarceration cannot be the basis of a finding of duress. The parties do not agree which harmless error standard applies, but we need not decide because, under either standard, we cannot conclude the error to be

44

harmless as to count 3 (Terri G.), and we conclude the error is harmless as to count 10 (Anna B.). Though we concluded there was substantial evidence to support the conviction for oral copulation by means of duress in count 3, there was not enough evidence to render it even reasonably probable that defendant would not have achieved a more favorable result had the jury been instructed in kind. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) On the other hand, as to count 10, it is clear beyond a reasonable doubt that the jury did not base its finding of duress on fear of incarceration or arrest because Anna B. clearly testified she was not afraid of incarceration but asked defendant to take her to jail, and there was no conflicting evidence presented. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].) Therefore, we reverse defendant's conviction as to count 3 only.

### 2.2.2 Erroneous Special Instruction

The trial court provided the jury a special instruction that read as follows: "Several of these Instructions for the charged crimes or enhancements require you to determine whether the defendant made 'a threat' or 'threatened' to do something. When these Instructions require that you consider such 'threats,' it is not necessary to conclude that the defendant spoke the threat in express words, nor are particular words otherwise required for the threat. The Jury may conclude that the defendant 'threatened' to do the thing required by the Instruction so long as the jury is convinced, beyond a reasonable doubt, that the defendant's words, conduct *and/or* the surrounding circumstances of the alleged threat convey a threat or are interpreted to convey a threat to do the thing required by the Instruction. This Instruction does not change the requirement that the People are required to prove, beyond a reasonable doubt, any particular intent or mental state required by the Instructions for the charged crimes or any other element required by the charged crimes." (Italics added.)

45

Defendant contends this instruction is erroneous because it did not require the jury to find defendant actually issued a threat but permitted the jury to find a threat based on the victim's subjective interpretation of the surrounding circumstances. Defendant specifically targets (1) use of the disjunctive possibility of "surrounding circumstances" alone as a basis for finding a threat and (2) finding a threat based on the disjunctive possibility of the victim subjectively interpreting that a threat has been conveyed. We do not encourage inclusion of the amorphous conjunction "and/or" in instructions because of the confusion it may spawn. Nonetheless, we conclude any error made by the trial court in providing this instruction was harmless.

With respect to the counts premised on defendant's threat to use his official authority to arrest or incarcerate the victim, even if the instruction would erroneously permit a jury to find such a threat based solely on the victim's subjective interpretation of the surrounding circumstances, we conclude such an error would be harmless here. "An instruction that . . . misdescribes an element of an offense is harmless only if 'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' [Citations.] 'To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 774.) For the jury to believe the victims orally copulated defendant and that the oral copulation was against their will, the jury also had to believe defendant had confined the victims in the rear seat of his patrol car and had impliedly threatened he would take them to jail if they did not perform sexual favors.

Except with respect to Anna B.—count 9—the jury was not presented with any evidence that defendant had not arrested or threatened to incarcerate the victim. And, even with respect to that count, defendant testified everything was consensual; Anna B. testified that after she admitted using heroin defendant told her he could take her to jail

46

and it was only then that she felt compelled to orally copulate him. Thus, for the jury to convict defendant, it had to believe defendant did impliedly threaten Anna B. by his words and conduct. We are persuaded beyond a reasonable doubt that any instructional error in incorrectly defining "threat" was harmless in relation to the evidence considered by the jury.

Additionally, because all the remaining kidnapping convictions[13] involve defendant's kidnapping the victims to commit oral copulation where defendant was convicted of oral copulation under threat of authority, any error is also harmless as to those convictions. Thus, we turn to whether the instruction was prejudicial as to defendant's remaining convictions for rape or oral copulation by means of duress— counts 20, 21, and 22 (Karen N.). As to those counts, we also conclude the instructional error, if any, was harmless in light of the evidence presented.

In the interaction that was the basis of his conviction in count 20, defendant entered Karen N.'s room uninvited, followed her into the bathroom, unzipped his pants, and impliedly demanded her to fellate him. There was no evidence to the contrary, as defendant denied the sexual encounter altogether. And in the interaction that was the basis of counts 21 and 22, defendant threatened to enter her room forcibly if Karen N. did not allow him in, ignored her illness, and demanded oral copulation and sex. Defendant claimed the fellatio and sex were consensual and that she invited him into the room. As to all three of these convictions, the jury necessarily found defendant entered her room with the intent to commit a felony. (See §§ 459-460 [first degree burglary occurs when someone enters an inhabited residence with intent to commit a felony]; 667.61, subd. (d)(4) [residential burglary sentencing enhancement].)

---

[13] We have already reversed count 23—the aggravated kidnapping of Karen N.—based on insufficient evidence.

47

The evidence, which the jury necessarily believed, showed that defendant forced his way into Karen N.'s room first by entering without being invited and following her into her bathroom, and then by threatening to enter forcibly if she did not allow him in and closing the door and window, thereby preventing anyone outside from hearing what happened within the room. This conduct by defendant, in addition to him unzipping his pants and suggesting she may want something, after a previous encounter in which she orally copulated him, was the only evidence of any threat with regard to these interactions. In light of this record and the jury's other findings, we conclude that even if the instruction was erroneous, beyond a reasonable doubt that error was unimportant.

### 2.3   *Williams* Instruction

"In *People v. Mayberry* (1975) 15 Cal.3d 143, our Supreme Court held that a defendant who entertains a reasonable and good faith, but mistaken, belief that a victim voluntarily consented to intercourse does not have the wrongful intent necessary to be convicted of rape by force. [Citation.] This defense has both a subjective and objective component. (*People v. Williams* (1992) 4 Cal.4th 354, 360.) In order to satisfy the subjective component, the defendant 'must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent.' (*Id*. at p. 361.) To satisfy the objective component, the defendant must show his belief regarding consent was formed in circumstances society will tolerate as reasonable. [Citation.] When warranted by the evidence, it is error for the court to decline an instruction on the effect of a defendant's reasonable and honest belief in the victim's consent." (*People v. Sojka* (2011) 196 Cal.App.4th 733, 736-737 (*Sojka*), quoting and citing *People v. Williams* (1992) 4 Cal.4th 354, 360 (*Williams*).) In *Williams*, the court further held that where a defendant claims a reasonable and good faith but mistaken belief in consent based on the victim's equivocal conduct, but there is also evidence that conduct occurred "*after* the defendant had exercised or threatened 'force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another,' " the jury should also be

48

instructed "that a reasonable mistake of fact may not be found if the jury finds that such equivocal conduct on the part of the victim was the product of 'force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another.' " (*Williams*, *supra*, 4 Cal.4th at p. 364.)

Here, the jury was instructed, based on CALJIC No. 10.65[14] (and in accordance with *People v. Mayberry* (1975) 15 Cal.3d 143 (*Mayberry*)) that "[t]he defendant is not guilty of [rape, unlawful oral copulation, or kidnapping] if he actually and reasonably believed the woman consented to [the intercourse, the act, or to go with defendant]. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually or reasonably believe the woman consented to [the intercourse, the act, or to go with defendant]. If the People have not met this burden, you must find the defendant not guilty."[15] Over defendant's objection, the jury was also instructed, purportedly in

---

[14] CALJIC No. 10.65 reads: "In the crime of unlawful [forcible rape] [oral copulation by force and threats] [forcible sodomy] [penetration of the [genital] [or] [anal] opening by a foreign object, substance, instrument or device by force, [violence] [fear] [or] [threats to retaliate]], criminal intent must exist at the time of the commission of the (crime charged). [¶] There is no criminal intent if the defendant had a reasonable and good faith belief that the other person voluntarily consented to engage in [sexual intercourse] [oral copulation] [sodomy] [or] [penetration of the [genital] [anal] opening by a foreign object, substance, instrument, or device]. Therefore, a reasonable and good faith belief that there was voluntary consent is a defense to such a charge[.] [, unless the defendant thereafter became aware or reasonably should have been aware that the other person no longer consented to the sexual activity.] [¶] [However, a belief that is based upon ambiguous conduct by an alleged victim that is the product of conduct by the defendant that amounts to force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of the alleged victim or another is not a reasonable good faith belief.] [¶] If after a consideration of all of the evidence you have a reasonable doubt that the defendant had criminal intent at the time of the accused sexual activity, you must find [him] [her] not guilty of the crime." (CALJIC No. 10.65 (7th ed. 2005).)

[15] Though initially applied in the context of rape, application of this defense has been extended to unlawful oral copulation. (See *People v. May* (1989) 213 Cal.App.3d 118,

49

accordance with *Williams* and also based on CALJIC No. 10.65, that "[a] belief that is based upon ambiguous conduct by an alleged victim that is the product of conduct by the defendant that amounts to duress or threats to use the authority of a public official to incarcerate or arrest the victim, a belief based on that type of ambiguous conduct in response to the defendant's own conduct is not a reasonable and good faith belief."

Defendant asserts three distinct errors based on the *Williams* instruction. First, he contends the instruction, as given by the trial court, was improperly applied to threats of official action. Second, he asserts the instruction improperly directed the jury to conclude his subjective belief in the victims' consent was not made in good faith. Third, he argues that when read in conjunction with the special instruction provided on threats discussed above, it negated the *Mayberry* defense by "allow[ing] the jury to infer, in circular fashion, that if the victim [subjectively] interprets the defendant's conduct as a threat, then the defendant cannot have a reasonable and good faith belief that the victim consented." We conclude the instruction was properly applied to threats of official action, and that the instruction was otherwise erroneous but that the error was harmless.

### 2.3.1   Application to Rape or Oral Copulation Under Threat of Authority

As stated above, the trial court instructed the jury that "[a] belief that is based upon ambiguous conduct by an alleged victim that is the product of conduct by the defendant that amounts to duress or *threats to use the authority of a public official to incarcerate or arrest the victim*, a belief based on that type of ambiguous conduct in response to the defendant's own conduct is not a reasonable and good faith belief." (Italics added.) Defendant contends this instruction is erroneous because it is not limited to unlawful arrests, thereby suggesting "that even those who are lawfully arrested and subject to lawful incarceration are incapable of consent, so much so that it is

128-129 [noting the failure to give a *Mayberry* instruction infected forcible copulation convictions].)

50

unreasonable for anyone to rely on the appearance of consent." This contention relies on a misinterpretation of *Williams*. Defendant also argues that because consensual sex between an arresting officer and an arrestee is punished as a lesser offense, "the idea that a lawfully arrested person might consent to have sex with the arresting officer is not so unthinkable that it 'offend[s] modern sensibilities' " so as to warrant provision of the *Williams* instruction. (*Williams*, *supra*, 4 Cal.4th at p. 364.) We are not persuaded.

"*Mayberry* is predicated on the notion that . . . reasonable mistake of fact regarding consent is incompatible with the existence of wrongful intent." (*Williams*, *supra*, 4 Cal.4th at p. 360; *Mayberry*, *supra*, 15 Cal.3d at pp. 154-155.) Thus, the *Mayberry* defense "negates the wrongful intent required for the crime." (*People v. Martinez* (2010) 47 Cal.4th 911, 954.) It is only available to aid a defendant where his belief of consent "was formed in circumstances society will tolerate as reasonable." (*Sojka*, *supra*, 196 Cal.App.4th at p. 737.) Thus, it has been limited by *Williams*, so that it is not available where the defendant's mistake of fact is based on the victim's equivocal conduct where that conduct is the product of the defendant's own conduct, i.e., " 'force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another' " (*Williams*, *supra*, 4 Cal.4th at p. 364) or a threat "to use the authority of a public official to incarcerate, arrest, or deport the victim or another . . . " (§§ 261, subd. (a)(7), 288a, subd. (k)).

Defendant contends provision of the *Williams* instruction indicates that a properly arrested person can never consent to orally copulate or have sex with the arresting officer. We disagree. Rather, it indicates that if the arresting officer claims he mistakenly believed the victim consented based on the victim's equivocal conduct that was brought about as a result of the arresting officer's threat of lawful arrest or incarceration, it is not reasonable for the officer to believe mistakenly that the victim consented to the sexual contact. We believe permitting an officer to rely on equivocal conduct on the part of the

51

victim to claim she consented when that conduct was a result of the officer's own extortionist threat to arrest or incarcerate the victim does "offend modern sensibilities" (*Williams*, *supra*, 4 Cal.4th at p. 364) and is not a set of "circumstances society will tolerate as reasonable" (*Sojka*, *supra*, 196 Cal.App.4th at p. 737). Thus, we conclude the *Williams* instruction was not erroneous for including threats of lawful as well as unlawful arrests or incarcerations.

Nor do we believe such a conclusion upsets the statutory scheme, which acknowledges the possibility of consensual sex between an arresting officer and arrestee, but criminalizes such conduct. Section 289.6, on which defendant relies, makes it a crime for "[a]n employee or officer of a public entity detention facility, or an employee, officer, agent of a private person or entity that provides a detention facility or staff for a detention facility, a person or agent of a public or private entity under contract with a detention facility, a volunteer of a private or public entity detention facility, or a peace officer who engages in sexual activity with a consenting adult who is confined in a detention facility," where a "detention facility" includes "[a] vehicle used to transport confined persons during their period of confinement, including transporting a person after he or she has been arrested but has not been booked," and where "sexual activity" includes "[s]exual intercourse" and "[o]ral copulation." (§ 289.6, subds. (a)(2), (c)(4), (d)(1) & (3).) Contrary to defendant's assertion, the fact that even consensual sex between an arresting officer and arrestee is criminal implies that such conduct does "offend modern sensibilities." (*Williams*, *supra*, 4 Cal.4th at p. 364.) Were it not offensive, it would not be criminal.

### 2.3.2 Improper Direction of Jury

Defendant next contends that the *Williams* instruction given in this case improperly directed the jury to find defendant asserted his belief in the victims' consent in bad faith based on its predicate finding that a victim subjectively felt threatened by

52

defendant's words or conduct, or the surrounding circumstances, and by extension to conclude defendant was dishonest. " 'In assessing a claim of instructional error, "we must view a challenged portion 'in the context of the instructions as a whole and the trial record' to determine ' "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' " (*People v. Tully* (2012) 54 Cal.4th 952, 1025.) We conclude the challenged instruction, when considered in the context of the instructions as a whole, was not improper.

Here, the instructions cumulatively read "[t]he defendant is not guilty of [rape, unlawful oral copulation, or kidnapping] if he actually and reasonably believed the woman consented to [the intercourse, the act, or to go with defendant]. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually or reasonably believe the woman consented to [the intercourse, the act, or to go with defendant]. If the People have not met this burden, you must find the defendant not guilty." The challenged instruction continued, "[i]n [enumerated] instructions [(summarized above)] you are instructed on the issue of defendant's belief of consent. A belief that is based upon ambiguous conduct by an alleged victim that is the product of conduct by the defendant that amounts to duress or threats to use the authority of a public official to incarcerate or arrest the victim is not a reasonable and good faith belief."

In this context, a "good faith" belief is one that is actually held. Thus, when read in the context of the instructions as a whole, the challenged instruction does not direct the jury to draw the conclusion that defendant was dishonest. Rather, the instruction merely directs the jury to conclude, *if* it finds defendant's belief of consent is based on a victim's ambiguous conduct that is the product of defendant's duress or threats, the defense based on defendant's actual and reasonable belief of consent does not apply. Thus, as a whole, the instruction does not direct the jury to infer that defendant was dishonest if it concludes his mistake of fact as to the victim's consent was not reasonable.

53

Even if the jury was directed to conclude the mistake was not a reasonable and good faith mistake, we cannot take the logical leaps suggested by defendant also to conclude the jury was reasonably likely to then infer that defendant was dishonest in his testimony as to his belief in the victims' consent, and subsequently to disbelieve the remainder of his testimony. The jury was instructed, "[i]f you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest." It was also instructed that assessing the credibility of the witnesses was solely within its province, and that the jury "may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe."

Here, with respect to the victims, some members of the jury clearly did believe part of some victims' testimony and not other parts. For example, though defendant was charged with the rape of Terri G. (counts 4 and 5), and Terri G. testified they had sex in the same circumstances for which defendant was convicted of oral copulation under threat of authority and by means of duress of Terri G., the jury did not convict defendant of these charges. The jury apparently did believe Terri G. as to her kidnapping and the oral copulation, but disbelieved she and defendant had sexual intercourse. There is no other conclusion to draw from the verdicts rendered, especially because defendant testified he had no sexual contact with Terri G. and claimed she had concocted her testimony. There is no reason to believe the jury would treat defendant any differently than it did Terri G. Thus, even if the jury drew the conclusion that defendant was dishonest in his testimony as to his belief of the victims' consent, it does not appear reasonably likely the jury would disbelieve the remainder of defendant's testimony.

54

Accordingly, we conclude the challenged instruction was not erroneous, but, even if it was in error, the error was harmless.

### 2.3.3   Negation of *Mayberry* Defense

Defendant contends that, when combined with the special instruction on threats discussed in part 2.2.2, *ante*, the *Williams* instruction provided here improperly negated the *Mayberry* defense.  The *Mayberry* defense is premised on the assumption that the victim did not actually consent.  (*Mayberry*, *supra*, 15 Cal.3d 143.)  Indeed it applies where, based on the victim's equivocal conduct, the defendant reasonably but mistakenly believes the victim has consented, thereby negating his criminal intent.  (*Williams*, *supra*, 4 Cal.4th at p. 360.)  The defense becomes unavailable, as stated in *Williams*, where the defendant causes the victim's equivocal conduct through the application of "force, violence, duress, menace, or fear" or some other set of socially intolerable circumstances. (§§ 261, subd. (a)(2), 288a, subd. (c)(2)(A); *Williams*, at p. 364.)  Nonetheless, the focus of the *Williams* inquiry is on whether the defendant has done something that causes his claim—that he reasonably and in good faith believed the victim consented—to "offend [our] modern sensibilities."  (*Williams*, at p. 364.)  Thus, while we disagree with defendant's claim that the *Williams* instruction is premised on the victim's behavior being "the product of duress that he knowingly and intentionally inflicted," we agree that the formulation of the special and *Williams* instructions provided was erroneous because it improperly permitted the jury to find defendant could not rely on his belief in the victim's consent based on her ambiguous conduct where that conduct was the product of some threat or duress *subjectively* perceived by her, regardless whether a threat or duress would be perceived by a reasonable person in the same circumstances.

Nonetheless, for the same reasons we found the instructional error in the special threat instruction harmless, we find any error that resulted from the incorporation of the threat instruction into the *Williams* instruction is also harmless.  As to each count of oral

copulation or rape under threat of authority, there was, at a minimum, an implied threat by defendant that if the women did not orally copulate or have sex with him, he would take them to jail, and there was no evidence such a threat was merely subjectively perceived by the victims, where defendant confined the women in the locked rear seat of his patrol car and asked what they could give him so they did not have to go to jail. In light of this record, the jury did not, beyond a reasonable doubt, apply the instructions in a manner that violated his constitutional rights. And, as above, because the remaining aggravated kidnapping convictions are based on his transporting the victims against their will to commit oral copulation, defendant was not prejudiced as to those counts by the erroneous instruction. Finally, with respect to counts 20, 21, and 22 (Karen N.), oral copulation and rape by means of duress, where defendant entered the victim's motel room uninvited or by threats to enter forcibly and with intent to commit a felony therein, which the jury necessarily found true in light of its findings on the residential burglary enhancement, any error in the threat instruction was harmless on the issue of the victim's consent.

### 3.0 Sentencing Errors

#### 3.1 Section 654

The trial court sentenced defendant to a life sentence for kidnapping Kayla R. for the purposes of rape or oral copulation (count 13), a consecutive determinate term of six years for oral copulation of Kayla R. by threat of official authority (count 15), and a consecutive two-year term for rape of Kayla R. by threat of official authority (count 16). Though defendant and Kayla R. met multiple times over the course of several months, the acts that were the basis of these three convictions all involved a single encounter in October 2011. Thus, defendant contends, and the People properly concede, the sentences for the rape and oral copulation by threat of official authority (counts 15 and 16) must be stayed pursuant to section 654 because those offenses and the aggravated kidnapping are

part of an indivisible course of conduct motivated by a single criminal objective. (*People v. Lewis* (2008) 43 Cal.4th 415, 519; *People v. Latimer* (1993) 5 Cal.4th 1203, 1216-1217.) On the facts before us, we agree. Therefore, we stay execution of defendant's sentence on counts 15 and 16.

### 3.2  Unauthorized Sentence

Defendant contends the trial court imposed an unauthorized sentence on counts 1, 8, 13, 23, and 25, when it imposed a sentence of seven years to life for his aggravated kidnapping of the victims (§ 209, subd. (b)(1)). We agree, except as to count 23. The punishment for a violation of section 209, subdivision (b)(1) is life with the possibility of parole. "A term of life with the possibility of parole does not have a minimum determinate term of seven years; rather, a person sentenced to such a term first becomes eligible for parole in seven years. (§ 3046, subd. (a)(1).)" (*People v. Robinson* (2014) 232 Cal.App.4th 69, 72, fn. 3.) Therefore, we modify defendant's sentence for counts 1, 8, 13, and 25, to life with the possibility of parole.

## DISPOSITION

The judgment is reversed as to counts 3, 19, 23, 24, and 27. The multiple victim enhancement alleged in association with count 21 (§ 667.61, subd. (e)(4)) is dismissed. Defendant's sentence on counts 1, 8, 13, and 25, is modified to life with the possibility of parole as to each count. Execution of defendant's sentence on counts 15 and 16 is stayed. We lift the stay of execution of sentence as to count 25. As modified, the judgment is affirmed. The matter is remanded to the trial court for retrial on count 3 and any applicable enhancements only. If the People elect to retry defendant as to count 3, the trial court shall resentence defendant following retrial. If, within 60 days after the remittitur issues from this court, the People have not filed and served an election to retry count 3, the trial court shall dismiss said count, and shall resentence defendant as necessary. The clerk of the trial court shall correct the indeterminate abstract of

57

judgment to include defendant's conviction for count 22 (oral copulation by duress—§ 288a, subd. (c)(2)(A)) in item 1 of that abstract.  We further direct the clerk of the trial court to prepare an amended abstract of judgment not inconsistent with the holdings expressed herein, and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.


        BUTZ        , J.


We concur:


      NICHOLSON     , Acting P. J.


      MAURO       , J.